UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN D. SEABRON, | ) |
| | ) |
| Plaintiff, | ) Case No. 11 C 1078 |
| | ) |
| v. | ) Magistrate Judge Sidney I. Schenkier |
| | ) |
| MICHAEL ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, plaintiff, Steven D. Seabron, moves to reverse and remand the final decision by the Commissioner of the Social Security Administration ("SSA") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") (doc. # 21). After the Commissioner's initial denial of his disability applications on July 6, 2007, and upon reconsideration on February 21, 2008, Mr. Seabron sought and received a hearing before an administrative law judge ("ALJ") on July 13, 2009 (R. 16). One week later, the ALJ issued a written decision finding Mr. Seabron not disabled and denying his applications for DIB and SSI (Id.). The Appeals Council denied review, and Mr. Seabron timely filed suit in this Court (doc. # 1). The Commissioner filed a response to Mr. Seabron's motion asking us to affirm the ALJ's decision (doc. # 23). For the reasons set forth below, we grant plaintiff's motion for remand, and deny the Commissioner's request for affirmance.

---

[1] On July 6, 2011, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 17).

**I.**

The administrative record establishes that Mr. Seabron, a high school graduate, was born May 30, 1982, and was 23 years old on the alleged disability onset date of September 15, 2005 (R. 26, 49). On his disability report, Mr. Seabron listed his height as 5'9" and his weight as 120 pounds (R. 194). He has lived with his paternal grandmother since childhood (R. 63-65). Mr. Seabron's activities of daily living ("ADLs") include shopping and preparing meals, washing dishes daily, vacuuming his room weekly, making his bed daily, doing laundry monthly, and taking out the garbage (R. 223-24). He exercises, and he can walk about a mile and lift about 30 pounds (R. 59).

Mr. Seabron's work history is vague, but both before and after his onset date, he appears to have achieved work primarily through temporary agencies, working at jobs such as a cashier at Dunkin Donuts and as a pizza delivery driver (R. 183, 195-96). At the hearing, Mr. Seabron also described doing janitorial and gardening work at a donut shop at the end of 2007 and beginning of 2008 (R. 41-42). In addition, Mr. Seabron did occasional warehouse work at Macy's until March 2009, when he had trouble with heavy lifting after losing 40 to 50 pounds, and falling to the weight of 120 pounds (R. 42-43). While the record is unclear, based on Mr. Seabron's earnings and work history reports, these jobs appear to have been mostly part-time and of short duration, except for during 2003, when Mr. Seabron earned over $16,000 working for a mobile telephone sales company (*see* R. 159-185, 195-96). Mr. Seabron has a driver's license, but he does not like to drive, so his grandmother drove him to and picked him up from his jobs (R. 61). The ALJ found that the work that Mr. Seabron performed after September 2005 did not amount to substantial gainful employment.

Mr. Seabron was first diagnosed with bipolar disorder when he was 15 or 16 years old (R. 22). Since at least 2004, Mr. Seabron has been prescribed Depakote and Zyprexa (brand name:

Olanzapine) for bipolar disorder, depression, and mood swings (R. 256). He has been hospitalized several times since then for both manic and depressive behavior, including auditory and visual hallucinations, and suicidal and homicidal thoughts. For example, the medical record recounts that Mr. Seabron has at times believed he was the deceased singer 2pac Shakur and his girlfriend was Aaliyah (R. 224), or that AT&T stole ideas from him (R. 285-86).

Mr. Seabron was admitted to Tinley Park Mental Health Center ("TPMHC") the year before the alleged onset date (R. 397). He stayed at the hospital from August 23, 2004, to September 7, 2004, receiving treatment for bipolar I disorder, mixed episode, severe with psychotic behavior (*Id.*).

Mr. Seabron next received inpatient treatment at TPMHC from January 28, 2006, through February 6, 2006. His family brought him to the emergency room because he was exhibiting bizarre behavior, including visual and auditory hallucinations: he heard a voice telling him to get help, and he had spent two weeks at his grandmother's home lying in bed contemplating suicide (R. 296, 303). At the hospital, Mr. Seabron reported to Dr. Stuart Rich that he had not taken his medication for a year (R. 303). Dr. Rich's examination revealed "significant thought disorder," but he found that Mr. Seabron's symptoms resolved upon restarting Zyprexa and Depakote (*Id.*). Upon discharge, Mr. Seabron's mood was good, he was not thought disordered, and he was not hallucinating (*Id.*). Dr. Rich diagnosed him with severe bipolar disorder with mixed (manic and depressive) psychotic features and cannabis abuse (*Id.*). Dr. Rich listed Mr. Seabron's Global Assessment Functioning ("GAF") at 55 (*Id.*), which is in a range (51-60) that indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *See Jelinek v. Astrue*, No. 10–3340, 2011 WL 5319852, at *1 n.1 (7th Cir. Nov. 7, 2011).

Ten days later, on February 10, 2006, Mr. Seabron was assessed at Will County Mental Health Center. The clinical assessment indicated that Mr. Seabron had rambling speech, paranoid delusions, and visual and auditory hallucinations, but was otherwise normal (R. 407). His diagnosis was listed as bipolar disorder with depressed mood and psychosis, and cannabis abuse, with a GAF of 30 (R. 409), which is even more severe than "a GAF between 41 and 50 [which] indicates [s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Jelinek*, 2011 WL 5319852, at *1 n.1.

Mr. Seabron was next admitted to voluntary in-patient hospital treatment at TPMHC for bipolar disorder on November 29, 2006, after going to the emergency room to request medication and telling people there that he wanted to kill the kid who stole his CDs (R. 272). A TPMHC psychiatrist, Dr. Shanta Nair, reported that Mr. Seabron had been noncompliant with his medication (*Id.*). Upon his discharge on December 6, 2006, Dr. Nair noted that Mr. Seabron's speech was coherent, with no psychotic features or thought disorder, but he was suffering from fatigue and malaise (R. 272, 276). At the time of his discharge, Mr. Seabron was assessed with a GAF score of 80 (R. 272), which is higher than the range (60-75), "indicating at worst some mild symptoms or some difficulty in [social, occupational, or school] functioning, but generally functioning pretty well." *Campbell v. Astrue*, 627 F.3d 299, 301 (7th Cir. 2010).

In the second half of 2006 and first half of 2007, Mr. Seabron frequently called or visited the Will County Mental Health Center seeking samples or refills of his medications (*see, e.g.*, 410, 414-15, 417, 424). Mr. Seabron was not always given his medications because he was unable to verify his financial information (*see, e.g.*, R. 425 (2/1/07) and R. 427 (9/14/06)). During this time, the

notes from Mr. Seabron's psychiatrist assessed Mr. Seabron with GAF ratings that ranged from stable, to fair, to poor (although no numeric scores were reported) (*see* R. 418-430).

On June 17, 2007, Mr. Seabron presented at the St. Joseph Hospital emergency room with psychotic, racing, and suicidal thoughts (R. 352). He was voluntarily admitted to Chicago Reed Mental Health Center for bipolar I disorder, manic episode, severe with psychotic behavior (R. 397). Upon admission, Mr. Seabron had poor attention, concentration, judgment, comprehension, and cognition, and was given a GAF ranging between 40 to 60 (R. 354-56), which, as explained above, indicates a range of serious (41-50) to moderate (51-60) symptoms and difficulty in social, occupational, or school functioning. *Jelinek*, 2011 WL 5319852, at *1 n.1. Mr. Seabron was angry at his family members, hypomanic, confused, disorganized, and he was having homicidal thoughts and tangential conversations (R. 366). Mr. Seabron reported losing 40 to 50 pounds in the last two years since he ran out of his medications (R. 360).

Mr. Seabron was discharged from the hospital 10 weeks later, on August 2, 2007. In addition to bipolar disorder, Mr. Seabron was diagnosed with cannabis abuse and borderline intellectual functioning (R. 349, 372). The discharge notes stated that upon restarting his medications, his thought process, attention span, and weight gain were improving (R. 348). Upon discharge, Mr. Seabron's psychotic symptoms were "in remission," and his mood was stable (with tangential thought process), and he was not suicidal, homicidal, or violent (R. 349). His GAF score was assessed at between 55 and 65 (*Id.*).

While notes from Mr. Seabron's psychiatrist indicate that his mood was generally stable in the second half of 2007 (R. 411, 413, 416), his symptoms fluctuated in 2008 and 2009. Notes from the Will County psychiatrist from the second half of 2008 and the first half of 2009, indicate that Mr.

Seabron was generally doing well with fair insight and appropriate and logical thought, albeit with disorganized thought process and questionable social judgment (*see* R. 464-65, 467-70). On April 3, 2008, however, the doctor noted that Mr. Seabron appeared with blunted and constricted mood, sparse speech, and vague attention and concentration (R. 471).

Mr. Seabron enjoys group therapy, and he was generally stable and attentive during his attendance at group therapy from late 2007 through early 2009 (*see, e.g.*, R. 48-49, 456-60). He has also found hobbies to take his mind off his sadness, such as keeping a journal and gardening, and spending time with positive people like his grandmother's neighbor (R. 48, 51, 65-66). Sometimes, however, he still has trouble interacting with people, maintaining relationships, and being accepted in society and his family (R. 217-19, 257). On November 18, 2008, Mr. Seabron felt depressed and sleepy at group therapy (R. 460), and on March 3, 2009, he was tired and fell asleep in group (R. 457). His grandmother testified that Mr. Seabron has gotten progressively more depressed over the years, and working many hours gets him increasingly agitated so that he cannot function (R. 66).

Consistent with the Will County treatment notes, at the hearing, Mr. Seabron testified that his medications – Depakote and Zyprexa – make him tired. Mr. Seabron testified that he fell asleep during a group therapy session (R. 55, 57), and that he takes about two naps a day because he sometimes has trouble sleeping at night, and some days he stays in bed until 5 or 6 p.m. after his afternoon nap because he gets so sad (R. 58-59). Mr. Seabron's grandmother helps him remember to take his medications, but sometimes he does not take them because he cannot afford them (R. 220, 242, 257). For example, in March 2009, he testified that he stopped taking his medication because he could no longer get it free through public aid (R. 42-43).

Mr. Seabron also testified that he has been trying to stop taking cannabis and alcohol since 2006 (R. 45-46). His grandmother has never seen him drunk, but she knows that he has smoked marijuana (R. 61-62).

## II.

The Department of Disability Services ("DDS") issued multiple reports based on the documentary evidence of Mr. Seabron's mental condition as indicated above. In the first half of 2007, a DDS adjudicator wrote a psychiatric report based on the medical evidence from September 2004 to March 2007 (R. 323-26). The report noted that Mr. Seabron's history of auditory and visual hallucinations, depression, suicidal thoughts, rapid speech, loose associations, labile affect, and euphoric mood waxed and waned throughout the years because of poor medication compliance (R. 323-24). The report stated that Mr. Seabron's ADLs were good, he was able to take care of his personal needs (R. 323), and Mr. Seabron did well at work when he took his medications (R. 326).

On June 26, 2007, Kirk Boyenga, PhD, completed a Psychiatric Review (R. 327-40) and Mental Residual Functional Capacity ("RFC") Assessment (R. 316-19) for Mr. Seabron based on the available documents. Dr. Boyenga noted that Mr. Seabron's grandmother said that Mr. Seabron cannot focus, has trouble maintaining relationships, hears voices, and is paranoid and delusional (R. 339). Furthermore, Mr. Seabron cries often, has mood swings, sleeps poorly, and has attempted suicide three times (*Id.*). Nevertheless, Dr. Boyenga stated that the documents showed Mr. Seabron is fully oriented and free of thought disorder or serious memory problems (R. 318), despite having used vulgar language in his ADL report to describe girls who steal his money (R. 339).

Dr. Boyenga also opined that Mr. Seabron can function and work well when he takes his prescribed medications (R. 318). Dr. Boyenga concluded that while Mr. Seabron is moderately

limited in his ability to maintain attention and concentration for extended periods (R. 316), he can perform simple, routine, repetitive tasks, and can follow instructions (R. 318). We note that Dr. Boyenga also concluded that Mr. Seabron had no limitations in his ability to carry out detailed instructions (R. 316), without the benefit of the subsequent assessment on August 2, 2007, that Mr. Seabron had borderline intellectual functioning (R. 349).

Dr. Boyenga also noted that Mr. Seabron is independent with ADLs, he drives a car, and he has resources to get illicit drugs (R. 318). Dr. Boyenga stated that "[r]eports of activities submitted by claimant are of marginal validity, in light of likely falsification and inconsistency with other information in the file (*Id.*)."[2] Furthermore, the report stated that while Mr. Seabron's social skills are impaired and he is moderately limited in his ability to deal with the general public, he is able to relate well with family and friends and has no significant limitation in his ability to interact with coworkers and peers "without distracting them or exhibiting behavioral extremes" (R. 317-18). While acknowledging that available documents show Mr. Seabron "does decompensate from time to time," Dr. Boyenga found that "those episodes are also related to drug abuse" (R. 318, 337).

On June 28, 2007, a DDS adjudicator determined that Mr. Seabron was not disabled based on Dr. Boyenga's assessment (R. 230). The adjudicator found that Mr. Seabron was unable to function above the level of unskilled work which does not require sustained, appropriate interaction with the general public, close supervision, or close cooperation with coworkers (*Id.*). The adjudicator noted several unskilled jobs that can accommodate these limitations, including drier attendant and skin lifter - bacon (*Id.*).

---

[2]The Court notes that Dr. Boyenga never examined Mr. Seabron, despite opining that Mr. Seabron falsified his information.

8

On February 9, 2009, Michael Cremerius, PhD, reviewed the medical documents and formed an opinion on Mr. Seabron's alleged mental impairments (R. 440-45). Dr. Cremerius opined that Mr. Seabron has severe mental impairments that do not meet or equal a listing, and that Mr. Seabron's symptoms are adequately managed when he takes his prescribed medications (R. 441). Dr. Cremerius stated that because the ADL reports show he can manage several independent behaviors, Mr. Seabron retains the capacity to perform at least simple unskilled activities, with limited contact with the public (*Id.*). Dr. Cremerius found moderate restrictions in Mr. Seabron's social functioning, affecting his ability to interact appropriately with the public, supervisors, co-workers, and to respond appropriately to routine work situations and changes (R. 442, 447). Dr. Cremerius also concluded that Mr. Seabron has moderate difficulties in maintaining concentration, persistence, or pace, and fell in the "moderate" category with respect to repeated episodes of decompensation of extended duration (R. 442).

### III.

At the administrative hearing, after the testimony from Mr. Seabron and his grandmother, the VE testified that Mr. Seabron had two past relevant work positions which amounted to substantial gainful activity ("SGA") – bakery clerk, which was light, unskilled work, and telecommunications sales clerk, which was light, semi-skilled work (R. 68). The ALJ posited a hypothetical individual who was "limited basically to simple unskilled light work and because of the tiredness, no work in unprotected heights or on dangerous moving machinery, [or] open planks or bodies of water" (R. 69). The VE opined that person could not return to Mr. Seabron's past relevant work because a bakery clerk uses dangerous equipment, and the telecommunications position involves more than simple, unskilled work (*Id.*). The VE testified, however, that other positions

were available in significant numbers in the geographical region which the hypothetical individual could perform, even with the added restriction of no public contact and no more than superficial contact with supervisors and co-workers (R. 69, 72).

The VE testified that no jobs would be available for a hypothetical individual for whom bipolar disease, tiredness, depression, or side effects from medication would cause: (1) to lie down two times during the workday, an hour each time; (2) to miss work more than two times per month; or (3) to be off task an average of 15 minutes each hour (R. 70-71).

## IV.

In his opinion, the ALJ found that Mr. Seabron was not under a disability from his alleged onset date of September 15, 2005, to the date of the decision (R. 27). At Step 1, the ALJ determined that Mr. Seabron had not engaged in substantial gainful activity since the alleged onset date of September 15, 2005 (R. 18). At Step 2, the ALJ determined that Mr. Seabron suffered from two severe impairments, bipolar disorder and polysubstance abuse, which significantly limit Mr. Seabron's ability to perform basic work activities (R. 18-19).

At Step 3, the ALJ found that Mr. Seabron did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, specifically Listings 12.04 and 12.09 (R. 19). The ALJ found that the Paragraph B criteria were not met because Mr. Seabron has only mild restrictions in his ADLs, and only mild difficulties in social functioning, since he lives with his grandmother, has no reported relationship difficulties with his sister, plays cards with his neighbor, and has shown marked improvement in his ability to socialize with his peers (*Id.*). The ALJ found Mr. Seabron has moderate difficulties in maintaining concentration, persistence or pace